## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PETER D'ARCY, derivatively on behalf of VELODYNE LIDAR, INC., | |
| Plaintiff, | C.A. No. |
| v. | |
| ANAND GOPALAN, ANDREW HAMER, DAVID S. HALL, MARTA THOMA HALL, JOSEPH B. CULKIN, MICHAEL E. DEE, JAMES A. GRAF, BARBARA SAMARDZICH, and CHRISTOPHER A. THOMAS, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| and | |
| VELODYNE LIDAR, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

## <u>INTRODUCTION</u>

Plaintiff Peter D'Arcy ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Velodyne Lidar, Inc. ("Velodyne" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Anand Gopalan ("Gopalan"), Andrew Hamer ("Hamer"), David S. Hall ("D. Hall"), Marta Thoma Hall ("M. Hall"), Joseph B. Culkin ("Culkin"), Michael E. Dee ("Dee"), James A. Graf ("Graf"), Barbara Samardzich ("Samardzich"), and Christopher A. Thomas ("Thomas") (collectively, the "Individual Defendants," and together with Velodyne, the "Defendants") for breaches of their fiduciary duties as directors, officers, and/or controlling shareholders of Velodyne, unjust

1

enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff's and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Velodyne, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Velodyne's directors, officers, and/or controlling shareholders from November 9, 2020 through February 19, 2021 (the "Relevant Period").

2.      Based in California, Velodyne is the pioneer developer of lidar technology—a remote sensing method invented by Company founder, Defendant D. Hall, that uses light in the form of lasers to measure distances by illuminating the target with laser light and measuring the time of reflection the light takes to return to the sensor. The Company has remained a market leader particularly by making its technology widely available and affordable for both corporate and consumer markets. Defendant D. Hall's 2005 invention revolutionized the capacity for advanced

driver assistance systems and created technological enhancements in various industries and products including, among others, mapping, robotics, and security appliances.

3.      Velodyne incorporated upon spinning off from its predecessor, Velodyne Acoustics, Inc. ("Velodyne Acoustics"), in December 2015, when Velodyne Acoustics assigned all of its assets and operations in lidar technology to the Company. Nearly five years later, on September 29, 2020, the Company went public through a reverse merger with Graf Industrial Corp. ("Graf Industrial"), a special purpose acquisition company based in Houston, Texas that had been formed in 2018 for the sole purpose of raising capital through an initial public offering to acquire an existing company and then merging with that entity to take it public.

4.      Although the Company's SEC filings recognized how critical Defendant D. Hall was to Velodyne's operations and reputation, throughout the Relevant Period, the Individual Defendants made and caused the Company to make materially false and misleading statements that concealed the fact that certain members of Velodyne's Board of Directors (the "Board") and officers, including Defendant D. Hall and his wife, Defendant M. Hall, were being investigated by the Company for improper conduct and that those directors and officers had failed to operate with respect, honesty, integrity, and candor in their dealings with the Company's officers and directors (the "D&O Misconduct").

5.      Specifically, on November 9, 2020, the Company filed its 3Q20 10-Q (defined below) which represented that the Company's disclosure controls and its internal controls were "effective," marking the beginning of the Relevant Period. Although the Board's Audit Committee had already commenced an investigation into the D&O Misconduct, the Individual Defendants failed to disclose the investigation when the Company announced its preliminary fourth quarter and full year 2020 financial results on January 7, 2021. Instead, the 3Q20 10-Q detailed, among

other things, that the Company's annual revenue was approximately $94 million and that it had $350 million in cash on its balance sheet as of December 31, 2020.

6.       Then, less than a week later, on January 13, 2021, the Company announced that Defendant D. Hall had "voluntarily transitioned" from serving as the Company's Executive Chairman to a "non-executive" role. However, the Individual Defendants again failed to reveal the ongoing investigation of the D&O Misconduct.

7.       On January 22, 2021, the Company announced that Defendant Samardzich had decided not to stand for re-election as a Company director and that her decision was not the result of a "disagreement" with Velodyne on any matter regarding the Company's "operations, policies or practices." Still, the Individual Defendants failed to disclose that the Audit Committee had been investigating the D&O Misconduct.

8.       About one month after Defendant Samardzich's decision, the Company announced that Defendant Graf had resigned as a Company director. Velodyne's statement declared that Defendant Graf's decision to step down, like Defendant Samardzich's decision, was "not a result of any disagreement with the Company." Notably, the Company once again failed to mention that the Audit Committee's investigation into the D&O Misconduct was well underway and, in fact, nearly completed.

9.       The truth was revealed to the public on February 22, 2021, when, prior to the market opening, the Company announced that the Board had removed Defendant D. Hall as Velodyne's Chairman of the Board and terminated Defendant M. Hall's employment with the Company as its Chief Marketing Officer ("CMO") following an investigation conducted by the Company's Audit Committee that had commenced in December 2020. The Company announced that the investigation had found that Defendants D. Hall and M. Hall each "behaved inappropriately" and

failed to operate with "respect, honesty, integrity, and candor" in their dealings with the Company's officers and directors. Moreover, the Company announced that the Board had formally censured both Defendants D. Hall and M. Hall but that each would remain on the Board as Company directors.

10.     On this news, the price of the Company's stock dropped from $21.11 per share at the close of trading on February 19, 2021, to $17.97 at the close of the next trading day, on February 22, 2021, a drop of $3.14 per share, or approximately 15%, on heavy trading volume. Moreover, the price of the Company's warrants dropped from $7.37 per warrant at the close of trading on February 19, 2021, to $5.90 at the close of trading on February 22, 2021, a drop of $1.47 per warrant, or approximately 20%.

11.     On March 2, 2021, Defendant D. Hall informed the Company "of his voluntary decision to resign" from the Board, effective immediately.

12.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Velodyne's business, operations, and compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*: (1) the D&O Misconduct; (2) that Velodyne and its Audit Committee had been investigating the D&O Misconduct; (3) consequently, the statements touting Velodyne's business, operations, and prospects were materially false and misleading and/or lacked a rational basis; and (4) that Velodyne failed to maintain internal controls. As a result of the foregoing, Velodyne's public statements were materially false and misleading at all relevant times.

13.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

14.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

15.     In further breach of their fiduciary duties, the Individual Defendants either engaged in and/or permitted, and/or allowed the Company to engage in the D&O Misconduct.

16.     In light of the Individual Defendants' misconduct, which has subjected the Company, its President and Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

17.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's and CFO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Velodyne's Board cannot consider a demand to commence

litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

19.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

23.     Venue is proper in this District because Velodyne and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

24.     Plaintiff is a current shareholder of Velodyne common stock. Plaintiff has continuously held Velodyne common stock at all relevant times.

### Nominal Defendant Velodyne

25.     Velodyne is a Delaware corporation with its principal executive offices located at 5521 Hellyer Avenue, San Jose, California 95138. Velodyne's shares of common stock trade on The Nasdaq Stock Market LLC (the "NASDAQ") under the ticker symbol "VLDR." Velodyne's warrants, each exercisable for three-quarters of one share of common stock, trade on the NASDAQ under the ticker symbol "VLDRW."

**Defendant Gopalan**

26.     Defendant Gopalan has served as the Company's President and CEO since January 2020 and as a Company director since July 2019. Previously, he served as Velodyne's Chief Technology Officer ("CTO") beginning in June 2016. According to the Company's current report filed on Form 8-K filed with the SEC on October 5, 2020 (the "October 2020 8-K"), as of September 29, 2020, Defendant Gopalan beneficially owned 1,482,646 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 29, 2020 was $24.75, Defendant Gopalan owned approximately $36.7 million worth of Velodyne stock.

27.     The Company's Schedule 14A filed with the SEC on September 14, 2020 (the "2020 Proxy Statement") stated the following about Defendant Gopalan:

> Upon the consummation of the Business Combination, Dr. Gopalan will serve as the post-combination company's chief executive officer, president and a member of the post-combination company Board. Dr. Gopalan has served as Velodyne's chief executive officer since January 2020 and as a member of Velodyne's board of directors since July 2019. Prior to becoming Velodyne's chief executive officer in January 2020, Dr. Gopalan had served as Velodyne's chief technology officer since June 2016. In his role as chief technology officer, Dr. Gopalan was responsible for all the new technology and advanced product development at Velodyne. He further worked alongside Mr. Hall on technology and business strategy, and was the technical face of Velodyne with all its major customers. Dr. Gopalan brings close to fifteen years of experience in electrical engineering, opto-electronics and semiconductors to the post-combination company. Previously, Dr. Gopalan served in various technology executive roles, most recently as vice president of engineering at Rambus Incorporated, a microchip interface and

architecture company, from March 2013 until May 2016. From June 2005 to March 2013, Dr. Gopalan served in various roles, including as director of R&D and mixed-signal IP development at Kawasaki Microelectronics, Inc., a microchip company. Dr. Gopalan holds a B.E. in electronics from the University of Mumbai, an M.S. in electrical engineering and a Ph.D. in microsystems from Rochester Institute of Technology.

**Defendant Hamer**

28.     Defendant Hamer has served as the Company's CFO and Treasurer since July 2019. Previously, he served as the Company's interim CFO and Treasurer from April 2019 until July 2019. According to the October 2020 8-K, as of September 29, 2020, Defendant Hamer beneficially owned 91,806 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 29, 2020 was $24.75, Defendant Hamer owned approximately $2.3 million worth of Velodyne stock.

29.     The 2020 Proxy Statement stated the following about Defendant Hamer:

Upon the consummation of the Business Combination, Mr. Hamer will serve as the post-combination company's chief financial officer and treasurer. Mr. Hamer has served as Velodyne's chief financial officer and treasurer since July 2019. Mr. Hamer served as interim chief financial officer and treasurer from April 2019 to July 2019. Previously, from October 2017 to September 2018, Mr. Hamer served as chief financial officer of Anomali, Inc. From October 2016 to April 2017, he served as chief financial officer of Sungevity, Inc. From June 2010 to February 2016, Mr. Hamer served as chief financial officer of ON24 Inc. Prior to that, Mr. Hamer was chief financial officer of Keynote Systems, Inc. and he held chief financial officer and vice president of finance and administration positions at KnowNow, Inc., IQ Labs and Intraspect Software, Inc. Prior to 2000, Mr. Hamer served in various financial positions at Excite@Home and Sybase, Inc. Mr. Hamer holds a Master of Accountancy from Florida International University and a B.S. in Accounting from the State University of New York at Binghamton.

**Defendant D. Hall**

30.     Defendant D. Hall is the founder of the Company and is married to Defendant M. Hall. Defendant D. Hall served as a Company director from December 2015 until he resigned in March 2021. He also served as the Company's Executive Chairman from January 2020 until he

resigned in January 2021. Previously, he served as the Company's CEO from December 2015 until January 2020. He also served as the CEO of Velodyne Acoustics, the Company's predecessor, from 1983 until Velodyne was formed as an independent entity in December 2015. According to a Schedule 13D filed with the SEC on February 12, 2021, as of February 12, 2021, Defendant D. Hall beneficially owned 98,545,299 shares of the Company's common stock, which represented 58.4% of the Company's outstanding shares of common stock on that date making him a controlling shareholder.[1] Given that the price per share of the Company's common stock at the close of trading on February 12, 2021 was $23.22, Defendant D. Hall owned over $2.4 billion worth of Velodyne stock.

31.     The 2020 Proxy Statement stated the following about Defendant D. Hall:

Upon the consummation of the Business Combination, Mr. Hall will serve as the post-combination company's executive chairman. Mr. Hall served as chief executive officer and a member of the board of directors of Velodyne's predecessor, Velodyne Acoustics, Inc., from 1983, when he founded the company, until Velodyne was formed as an independent entity in December 2015. Mr. Hall served as the chief executive officer and a member of the board of directors of Velodyne since December 2015 and transitioned from chief executive officer to executive chairman, effective January 2020. In his role as executive chairman, Mr. Hall will remain actively involved in the post-combination company's product and technology development strategy. Since December 2015, Mr. Hall has also served as chief executive officer of Velodyne Acoustics, LLC, a currently unrelated entity holding the assets of Velodyne's former acoustics business following a spin-off transaction in August 2016. Throughout his career, Mr. Hall has been inventing and building products across diverse industries including precision machining, loudspeaker design, acoustical engineering, electronics, microprocessors, real-time systems, vision-recovery technology and robotics. His inventions include the servo-driven subwoofer, which established Velodyne Acoustics as a leading company in the home theater movement of the 1980s and 1990s. After competing as one of the original entrants in the DARPA Grand Challenge, in 2005 Mr. Hall invented 3D Lidar to give autonomous vehicles real-time 360-degree vision. Possessing

---

[1] 38,675,038 shares are subject to voting proxy, i.e., those shares consist of shares of common stock held by other former Velodyne stockholders over which, except under limited circumstances, Defendant D. Hall holds an irrevocable proxy, pursuant to agreements between Defendant Hall and other stockholders, including certain of the Company's directors and officers such as Defendants M. Hall and Culkin.

substantial experience in the industry, Mr. Hall is a thought leader on matters related to lidar and its pivotal role in the autonomous revolution. In 2018, Mr. Hall was honored as the Inventor of the Year by the Intellectual Property Owners Education Foundation in recognition of his significant contributions to lidar technology. Mr. Hall holds a B.S. from Case Western Reserve University.

**Defendant M. Hall**

32.     Defendant M. Hall has served as a Company director since January 2020 and is married to Defendant D. Hall. Previously, she served as the Company's CMO from January 2020 until she was terminated in February 2021. She also served as Velodyne's President and Chief Business Development Officer from December 2015 to January 2020. She also served as Vice President of Marketing of Velodyne's predecessor, Velodyne Acoustics, from 2009 to 2010 and then as President from 2010 until Velodyne was formed as an independent entity in December 2015. According to a Schedule 13D filed with the SEC on February 12, 2021, as of February 12, 2021, Defendant M. Hall beneficially owned 6,318,227 shares of the Company's common stock, which represented 3.7% of the Company's outstanding shares of common stock on that date.[2] Given that the price per share of the Company's common stock at the close of trading on February 12, 2021 was $24.75, Defendant M. Hall owned approximately $146.7 million worth of Velodyne stock.

33.     The 2020 Proxy Statement stated the following about Defendant M. Hall:

Upon the consummation of the Business Combination, Ms. Hall will serve as the post-combination company's chief marketing officer and a member of the post-combination company Board. Ms. Hall served as vice president of marketing of Velodyne's predecessor, Velodyne Acoustics, Inc., from 2009 to 2010 and then as president from 2010 until Velodyne was formed as an independent entity in December 2015. Ms. Hall served as Velodyne's president and chief business development officer from December 2015 to January 2020. Ms. Hall has served as Velodyne's chief marketing officer and a member of Velodyne's board of directors since January 2020. Since 2009, Ms. Hall has helped grow Velodyne through a focus on marketing, business development, and leadership. During this time,

---

[2] Defendant D. Hall holds a proxy over all of Defendant M. Hall's shares.

alongside David Hall, Velodyne's executive chairman, Ms. Hall led the company through the transition from primarily selling acoustics equipment to developing and selling lidar. Before joining Velodyne's predecessor in 2009, Ms. Hall operated her own business, engaging with civic entities nationwide. Ms. Hall received the Most Influential Woman in Business Award in 2019 from the San Francisco Business Times. Ms. Hall holds a Master's Degree from San Francisco State University and a Bachelor's Degree from the University of California, Berkeley.

**Defendant Culkin**

34.     Defendant Culkin has served as a Company director since September 2016 and as Chairman of the Board since February 19, 2021. According to the October 2020 8-K, as of September 29, 2020, Defendant Culkin beneficially owned 13,559,196 shares of the Company's common stock, which represented 7.8% of the Company's outstanding shares of common stock on that date.[3] Given that the price per share of the Company's common stock at the close of trading on September 29, 2020 was $24.75, Defendant Culkin owned approximately $333.6 million worth of Velodyne stock.

35.     The 2020 Proxy Statement stated the following about Defendant Culkin:

Upon the consummation of the Business Combination, Mr. Culkin will serve on the post-combination company Board. Mr. Culkin has served as a member of Velodyne's board of directors since September 2016. In 1987, Mr. Culkin founded New Logic Research, Inc., a provider of high-performance membrane filtration systems, and has served in a variety of capacities including presently as chief technology officer. Mr. Culkin holds a B.S. in chemical engineering from the University of Pennsylvania, an M.A. in theoretical fluid mechanics from Johns Hopkins University, and a PhD in chemical engineering from Northwestern University. We believe Mr. Culkin is qualified to serve as a member of the post-combination company Board based on his operations and strategy experience in the scientific manufacturing industry.

**Defendant Dee**

36.     Defendant Dee has served as a Company director since September 2020. He also serves as a member of the Audit Committee. According to the October 2020 8-K, as of September

---

[3] Defendant D. Hall holds a proxy over all of Defendant Culkin's shares.

29, 2020, Defendant Dee beneficially owned 170,318 shares of the Company's common stock.

Given that the price per share of the Company's common stock at the close of trading on September

29, 2020 was $24.75, Defendant Dee owned approximately $4.2 million worth of Velodyne stock.

37.     The 2020 Proxy Statement stated the following about Defendant Dee:

> Upon the consummation of the Business Combination, Mr. Dee will serve on the post-combination company Board. Currently Mr. Dee is the President and Chief Financial Officer of Graf and has been in this role since September 2018 and also serves as a member of Graf's board of directors. Mr. Dee was a Senior Advisor to the President for Finance of the Asian Infrastructure Investment Bank in Beijing from January to July 2016 and also served as a member of its Investment Committee. From 2010 to 2015, Mr. Dee managed various private investments, including providing advice to SeaOne Maritime Corp., a startup focused on the monetization of natural gas and gas liquids and based in Texas. Mr. Dee was Senior Managing Director — International of Temasek Holdings Private Limited, Singapore's sovereign investment company, from 2008 to 2010 and also served as a senior member of its Management Committee and Investment Committee. Prior to joining Temasek, Mr. Dee worked at Morgan Stanley from 1981 to 2007 in a variety of senior positions in its capital markets, mergers and acquisitions and firm management divisions, including acting as Regional Chief Executive Officer for Southeast Asia and as Head of Morgan Stanley's Houston office. Mr. Dee served as the regional chairman of the Houston branch of Teach For America, Inc. and as a director of the Greater Houston Partnership. He was also appointed Singapore's Honorary Consul General in Houston. Mr. Dee received a Bachelor of Science degree in Economics from the Wharton School of the University of Pennsylvania in 1981. We believe Mr. Dee is qualified to serve as a member of the post-combination company Board based on his extensive experience in capital markets, corporate finance, private equity and mergers and acquisitions.

**Defendant Graf**

38.     Defendant Graf served as a Company director from September 2020 until he

resigned on February 15, 2021. He also served as a member of the Compensation Committee.

According to the October 2020 8-K, as of September 29, 2020, Defendant Graf beneficially owned

1,957,000 shares of the Company's common stock, which represented 1.1% of the Company's

outstanding shares of common stock on that date. Given that the price per share of the Company's

common stock at the close of trading on September 29, 2020 was $24.75, Defendant Graf owned

approximately $48.4 million worth of Velodyne stock.

39.    The 2020 Proxy Statement stated the following about Defendant Graf:

Upon the consummation of the Business Combination, Mr. Graf will serve on the post-combination company Board. Mr. Graf is currently the chief executive officer of Graf and has been in this role since Graf's inception in June 2018 and was a member of our board of directors from June 2018 to October 2019. Mr. Graf was a director of Platinum Eagle Acquisition Corp., from January 2018 to March 2019. Mr. Graf served as the vice president, chief financial officer and treasurer of Double Eagle Acquisition Corp. from its inception in June 2015 through its business combination with Williams Scotsman, Inc. in November 2017. He served as vice president, chief financial officer, treasurer and secretary of Silver Eagle Acquisition Corp. from its inception in April 2013 through Silver Eagle's business combination with VDTH, and he served as vice president, chief financial officer, treasurer and secretary of GEE from its inception in February 2011 to its business combination with Row 44, Inc. and Advanced Inflight Alliance AG in January 2013. He was vice chairman of Global Entertainment AG, the German entity holding GEE's equity in AIA from 2013 to 2014 and special advisor to GEE in 2013. He served as a special advisor to VDTH from 2015 to 2016. From 2008 to 2011 Mr. Graf served as a managing director of TC Capital Ltd., an investment bank, in Singapore. From 2007 to 2008, Mr. Graf was engaged as a consultant to provide financial advisory services to Metro-Goldwyn-Mayer, Inc. In 2001, Mr. Graf founded and became chief executive officer of Praedea, an enterprise software company with operations in the United States, Malaysia and Ukraine. The assets of Praedea were sold in 2006 to Mergent Inc, a wholly-owned subsidiary of Xinhua Finance Ltd., and renamed Mergent Data Technology, Inc., where Mr. Graf continued to serve as chief executive officer from 2006 to 2007. Praedea was renamed PSIC, and currently serves as an investment holding company for Mr. Graf. Mr. Graf continues to be chief executive officer of PSIC. Prior to founding Praedea, Mr. Graf was a managing director at Merrill Lynch, in Singapore from 1998 to 2000 and a consultant to Merrill Lynch in 2001. From 1996 to 1998, Mr. Graf served as a director and then managing director and president of Deutsche Bank's investment banking entity in Hong Kong, Deutsche Morgan Grenfell (Hong Kong) Ltd. From 1993 to 1996, he was a vice president at Smith Barney in Hong Kong and Los Angeles. From 1987 to 1993, Mr. Graf was an analyst and then associate at Morgan Stanley in New York, Los Angeles, Hong Kong and Singapore. Mr. Graf received a Bachelor of Arts degree from the University of Chicago in 1987. We believe Mr. Graf is qualified to serve as a member of the post-combination company Board based on his extensive leadership experience, background in corporate finance and mergers and acquisitions.

**Defendant Samardzich**

40.      Defendant Samardzich has served as a Company director since October 2016. She also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. According to the October 2020 8-K, as of September 29, 2020, Defendant Samardzich beneficially owned 102,823 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 29, 2020 was $24.75, Defendant Samardzich owned approximately $2.5 million worth of Velodyne stock.

41.      The 2020 Proxy Statement stated the following about Defendant Samardzich:

Upon the consummation of the Business Combination, Ms. Samardzich will serve on the post-combination company Board. Ms. Samardzich has served as a member of Velodyne's board of directors since October 2016. Ms. Samardzich retired from Ford Motor Company in October 2016 after 26 years in various roles. From November 2005 to January 2016, Ms. Samardzich held various senior leadership positions with Ford Motor Company, including most recently as chief operating officer of Ford Europe, and prior to that, from November 2005 to October 2010, Ms. Samardzich served as the vice president of powertrain operation. Prior to joining Ford, Ms. Samardzich held various engineering positions at Westinghouse Electric Corporation. Ms. Samardzich currently serves on the board of directors of Adient plc, where she is also a member of the audit committee and is chair of the compensation committee, BRP Inc., where she is also chair of the Investment and Risk Committee, and Aktiebolaget SKF. Previously, Ms. Samardzich served on the board of directors of MTS Systems Corporation. Ms. Samardzich holds a B.S. in mechanical engineering from University of Florida, an M.S. in mechanical engineering from Carnegie Mellon University, and an M.S. in engineering management from Wayne State University. We believe that Ms. Samardzich is qualified to serve as a member of the post-combination company Board based on her experience serving as a director of numerous public and private companies and her significant international automotive industry experience.

**Defendant Thomas**

42.      Defendant Thomas has served as a Company director since September 2020. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee.

43.     The 2020 Proxy Statement stated the following about Defendant Thomas:

Upon the consummation of the Business Combination, Mr. Thomas will serve on the post-combination company Board. Mr. Thomas was most recently a partner with McKinsey & Company from January 2011 to June 2020. Mr. Thomas served as co-Managing Partner for the Firm's Global Digital Strategy service line as well as its Global IoT service line, and as the leader of its Asia Semiconductor Practice. Mr. Thomas' client and research work focused on the artificial intelligence, automotive, cloud computing, smart home, server and storage end markets; the automotive, wireless, networking, power, analog, flash memory, and CPU product segments; and the semiconductor equipment, foundry and fabless verticals. Mr. Thomas also founded the CEO Circle, a regular gathering of more than 200 Chinese CxOs and China heads of multinational companies. Prior to McKinsey, Mr. Thomas spent ten years at Intel. Mr. Thomas was the General Manager of Intel China and also held multiple executive roles at Intel's global headquarters. These included Chief of Staff to Intel's Chief Sales, Marketing and Strategy Officer. Chris began his career as a private equity investor at The Blackstone Group in New York City. Mr. Thomas is a Visiting Professor at Tsinghua University and an invited member of the US-China Track II Dialogues on the Digital Economy. Mr. Thomas received an MBA from Stanford Business School, where he was an Arjay Miller Scholar, in 2000; a Master of Arts in Political Science, from Stanford University in 2000; and a Bachelor of Science in Economics, summa cum laude, from the Wharton School in 1996. We believe that Mr. Thomas is qualified to serve as a member of the post-combination company's board of directors based on his extensive international consulting and technology experience and financial expertise.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

44.     By reason of their positions as officers, directors, controlling shareholders, and/or fiduciaries of Velodyne and because of their ability to control the business and corporate affairs of Velodyne, the Individual Defendants owed Velodyne and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Velodyne in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Velodyne and its shareholders so as to benefit all shareholders equally.

45.     Each controlling shareholder, director and officer of the Company owes to Velodyne and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

46.     The Individual Defendants, because of their positions of control and authority as directors, officers, and/or controlling shareholders of Velodyne, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

47.     To discharge their duties, the officers, directors, and/or controlling shareholders of Velodyne were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

48.     Each Individual Defendant, by virtue of his or her position as a director, officer, and/or controlling shareholder, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors, officers, and/or controlling shareholders of Velodyne, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Velodyne's Board at all relevant times.

49.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ,

the Individual Defendants, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

50.     To discharge their duties, the officers and directors of Velodyne were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Velodyne were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Velodyne's own Code of Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Velodyne conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Velodyne and procedures for the reporting of the business and

internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Velodyne's operations would comply with all applicable laws and Velodyne's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

51. Each of the Individual Defendants further owed to Velodyne and the shareholders the duty of loyalty requiring that each favor Velodyne's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

52. At all times relevant hereto, the Individual Defendants were the agents of each other and of Velodyne and were at all times acting within the course and scope of such agency.

53.     Because of their advisory, executive, managerial, and directorial positions with Velodyne, each of the Individual Defendants had access to adverse, non-public information about the Company.

54.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Velodyne.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

55.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

56.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things: (i) to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

57.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred

under the authority of the Board, each of the Individual Defendants who are directors of Velodyne was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

58.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

59.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Velodyne and was at all times acting within the course and scope of such agency.

## VELODYNE'S CODE OF CONDUCT & GOVERNANCE

### *Code of Conduct*

60.     The Company's Code of Conduct states that it is meant to "represent the standards by which we all must operate" and that "[a]ll employees of the Company or any subsidiary of the Company (collectively, the "Company"), as well as the Company's officers and Board members, must abide by this Code of Conduct." Further, the Code of Conduct provides that "[w]e also expect the Company's contractors, consultants, suppliers, and agents to abide by our Code of Conduct in connection with their work for the Company."

61.     The Code of Conduct states the following:

**We operate with honesty and integrity**.[4] We are open, transparent, and honest. We keep our commitments to each other, to our customers, and to our partners. We

---

[4] All emphasis in original unless otherwise indicated herein.

21

endeavor to communicate with our customers, partners, fellow employees, and suppliers in an honest and unambiguous way, and to avoid making any misstatements of fact, making misleading or exaggerated communications, or creating false impressions. We may make mistakes, but we quickly admit and correct them.

62.     The Code of Conduct further states the following:

**We treat others fairly and respectfully**. We foster a respectful work environment free from any form of discrimination, harassment, and intimidation. We provide equal opportunity in all aspects of employment. We do not tolerate discrimination, harassment, violence, or threatening behavior of any kind. We treat everyone— fellow employees, customers, partners, and other stakeholders—with dignity and respect.

63.     The Code of Conduct also states the following regarding the Company's compliance with the law: **"[w]e are responsible and law abiding**. We follow the law. This includes all applicable international, national, and local laws, rules, and regulations. We report wrongdoing, including fraud or illegal acts, if we encounter it."

64.     The Code of Conduct goes on to provide that:

**We maintain accurate and complete business and financial records**. We create and maintain financial records in accordance with applicable legal requirements and generally accepted accounting practices. Our SEC reports, disclosures, and other public communications must be full, fair, accurate, timely, and understandable. Although financial reporting and controls are especially applicable to members of the Company's Finance Department, we are each responsible for complying with all financial controls and policies. We each acknowledge our responsibility to make sure that appropriate Finance Department personnel are made aware in a timely manner of any fact or issue that might have a material impact on our financial statements or disclosures.

65.     Regarding the use of the Company's assets, the Code of Conduct provides that:

**We protect and properly use Company assets**. Theft, carelessness, and waste have a direct impact on our profitability. We use Company assets for legitimate business purposes, and in particular, will use the Company's information systems assets in a responsible manner consistent with the Company's applicable policies and procedures.

66.     Regarding reporting violations of the Code of Conduct, the Code of Conduct states that, "[i]f we witness—or even suspect—a violation of our Code of Conduct, Company policies, or the law, we promptly report it to our manager or our General Counsel or via our compliance hotline."

### Corporate Governance Guidelines

67.     Pursuant to the Company's Corporate Governance Guidelines, "[t]he Company's business is conducted by its employees, managers, and officers, under the direction of the chief executive officer ("CEO") and the oversight of the Board, to enhance the long-term value of the Company and seek the best interests of its stockholders" and that "[i]n fulfilling their responsibilities, both management and the Board are informed by their fiduciary duties under applicable law."

68.     The Company's Corporate Governance Guidelines states that, among other responsibilities, the Board is to fulfill the following functions:

> The Board, as a whole and through its standing committees, has responsibility for the oversight of the Company's risk management.

> * * *

> The Audit Committee oversees the integrity of the Company's accounting and financial reporting systems, including overseeing the audit of the Company's annual financial statements by independent auditors, and assessing the Company's disclosure controls and procedures and systems of internal control.

### Audit Committee Charter

69.     The Company's Audit Committee Charter states that the purpose of the Audit Committee is to, among other things, "assist the Board with its oversight of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the qualifications, independence, and performance of the Company's

independent registered public accounting firm (the "independent auditor"), (iv) the design and implementation of the Company's internal audit function, if and when implemented, and (v) risk assessment and risk management."

70.     The Individual Defendants violated Velodyne's Code of Conduct and other corporate governance policies by engaging in or permitting the D&O Misconduct, the schemes to issue materially false and misleading statements to the investing public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and failing to report the same. Also in violation of the Code of Conduct and other corporate governance policies, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and conduct themselves in an honest and ethical manner.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

71.     Velodyne is a San Jose, California-based Company that claims to be a global leader in lidar technology and a provider of real-time 3D vision for autonomous systems, often referred to within the Company as "smart vision." Smart vision uses eye-safe lasers that measure precise distances to advance the development of automated systems by enabling machines to see their surroundings. Velodyne's proprietary lidar technology is designed to improve roadway safety, as it is used to control and navigate autonomous vehicles. Additionally, the Company's smart vision technology is used in, among other things, autonomous mobile robots, unmanned aerial vehicles, precision agriculture, and advanced security systems.

72.     In 1983, Defendant D. Hall founded the Company's predecessor, Velodyne Acoustics. In 2005, Velodyne Acoustics began developing its lidar technology and its lidar

products became commercially available in 2010, helping to revolutionize the capability of autonomy and advanced driver assistance systems. Thereafter, in December 2015, Velodyne incorporated as a new, spin-off, company and Velodyne Acoustics assigned all its assets and operations related to its lidar business to the Company. Shortly thereafter, on August 16, 2016, the Company announced it had raised approximately $150 million from Ford Motor Company ("Ford") and Baidu, Inc., a Chinese multinational technology company. As of September 30, 2020, Ford beneficially owned 7.6% of the Company's shares but had completely dissolved its stake in Velodyne as of December 31, 2020.

73.     In January 2020, Defendant Gopalan replaced Defendant D. Hall as CEO of the Company upon Defendant D. Hall's resignation from the position. Later that year, the Company went public on September 29, 2020 when it completed a reverse merger with Graf Industrial, a "blank check" company that was formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses. Specifically, according to the merger agreement filed with the SEC on July 2, 2020, Graf Industrial acquired Velodyne at an enterprise value of approximately $1.6 billion and an equity value of approximately $1.8 billion.

74.     According to the Company's filings with the SEC at or around the time of the reverse merger, industry icon Defendant D. Hall remained "deeply involved" in "all aspects" of the Company's business, including product development. Moreover, the Company acknowledged that the loss of Defendant D. Hall would adversely affect its business since it would be more difficult to, among other things, compete with other market participants, manage Velodyne's research and development activities, and retain existing customers or cultivate new ones. Further, the Company recognized that negative public perception of, or negative news related to, Defendant

D. Hall could adversely affect Velodyne's brand, relationship with customers, and standing in the industry.

**The D&O Misconduct**

75.     During the Relevant Period, the Individual Defendants allowed multiple violations of Velodyne's corporate governance policies to occur that injured the Company. These violations included, but were not limited to, engaging in and/or permitting the D&O Misconduct and engaging in or allowing widespread violations of the Company's Code of Conduct and governance policies as alleged herein. The D&O Misconduct resulted in, among other things, internal investigations, litigation against the Company, including the Securities Class Action, the removal and resignation of certain Company officers and directors, news articles reporting on the D&O Misconduct and the changes in the Company's leadership, and, consequently, a decline in the value of the Company.

**False and Misleading Statements**

***November 9, 2020 Form 10-Q***

76.     On November 9, 2020, the Company filed with the SEC its quarterly report for the fiscal quarter ended September 30, 2020 on Form 10-Q (the "3Q20 10-Q"). The 3Q20 10-Q was signed by Defendants Gopalan and Hamer, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Gopalan and Hamer attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

77.    In its section on controls and procedures, the 3Q20 10-Q made the following representations:

> Based on the evaluation of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report on Form 10-Q, our chief executive officer and chief financial officer concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level.
>
> * * *
>
> There were no changes in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) or 15d-15(d) of the Exchange Act during the period covered by this Quarterly Report on Form 10-Q, that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### January 7, 2021 Press Release

78.    On January 7, 2021, the Company issued a press release announcing its preliminary fourth quarter and full year 2020 revenue and providing an update on recent business trends. The press release stated the following, in relevant part:

- **2020 annual revenue of approximately $94 million**
- **Record shipments of 4,100 units**
- **$350 million of cash on the balance sheet at December 31, 2020**
- **Long-term outlook remains strong, but at this time 2021 guidance withdrawn due to reduced near-term visibility.**

> . . . Velodyne Lidar (NASDAQ: VLDR, VLDRW), the global leader in lidar technology founded by David Hall with foundational patents, today announced preliminary fourth quarter 2020 revenue and provided an update on recent business trends and outlook. During the fourth quarter of 2020, Velodyne shipped more than 4,100 sensors to its global customer base, bringing the annual total units shipped in 2020 to more than 11,500, including over 600 solid state Velarray units in the fourth quarter alone. These unit amounts represent a single quarter record for Velodyne, and the company believes that it has sold more sensors in 2020 than reported by all of its competitors combined. Additionally, Velodyne increased its signed and awarded contracts to 25 and expanded its pipeline to 183 projects across multiple end-markets and use cases, up from 175 since the end of the third quarter of 2020.

### January 13, 2021 Form 8-K

79.     On January 13, 2021, the Company filed a current report with the SEC on Form 8-K announcing that Defendant D. Hall had "voluntarily transitioned from serving as an employee and executive officer of the Company to a non-executive role."

*January 22, 2021 Form 8-K*

80.     On January 22, 2021, the Company filed a current report with the SEC on Form 8-K announcing Defendant Samardzich's decision that she "would not stand for re-election as a Class I director at the Company's 2021 annual meeting." The current report assured investors that Defendant Samardzich's decision was "not the result of any disagreement with the Company on any matter relating to the Company's operations, policies or practices."

*February 18, 2021 Form 8-K*

81.     On February 18, 2021, the Company filed a current report with the SEC on Form 8-K announcing that Defendant Graf had stepped down from his role as a Company director on the Board and that his decision to resign was also "not a result of any disagreement with the Company."

82.     The statements in ¶¶ 76–81 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*: (1) the D&O Misconduct; (2) that Velodyne and its Audit Committee had been investigating the D&O Misconduct; (3) consequently, the statements touting Velodyne's business, operations, and prospects were materially false and misleading and/or lacked a rational basis; and (4) that

Velodyne failed to maintain internal controls. As a result of the foregoing, Velodyne's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

83.     Prior to the market opening on February 22, 2021, the Company issued a press release, which was attached as an exhibit to a current report filed with the SEC on Form 8-K, titled "Velodyne Lidar Announces Changes to Board of Directors and Management Team; Names New Chairman and Chief Marketing Officer." Specifically, the Company's current report announced that "the Board removed David Hall as Chairman of the Board and terminated Marta Hall's employment as Chief Marketing Officer of the Company, effective immediately." Further, in replacing them, the Board "appointed Joseph B. Culkin, currently a member of the Board, as Chairman of the Board. Sally Frykman, the Company's current Chief Communications Officer, was appointed as Chief Marketing Officer."

84.     Additionally, the Company's press release revealed that Defendants D. Hall and M. Hall had been formally censured by the Board and were required to take remedial training, stating in relevant part:

> Velodyne Lidar, Inc. (Nasdaq: VLDR, VLDRW) today announced that Dr. Joseph B. Culkin, PhD, who has served as a member of Velodyne Lidar's Board of Directors since September 2016, has been appointed Chairman of the Board, effective immediately, succeeding David Hall. The Company also announced today that Sally Frykman, Chief Communications Officer, has been appointed to the additional role of Chief Marketing Officer, effective immediately, replacing Marta Thoma Hall.
>
> These actions follow the completion of an investigation by the fully independent Audit Committee of the Company's Board of Directors, which commenced in December 2020. The investigation was aided by independent legal counsel, Keker, Van Nest & Peters LLP, and reviewed certain statements and conduct by David Hall and Marta Thoma Hall. The investigation concluded that Mr. Hall and Ms. Hall each behaved inappropriately with regard to Board and Company processes, and failed to operate with respect, honesty, integrity, and candor in their dealings with Company officers and directors. Accordingly, the Board approved remedial

actions including the removal of Mr. Hall as Chairman of the Board and the termination of Ms. Hall as an employee of the Company. Mr. Hall had previously informed the Board that he was voluntarily transitioning from Executive Chairman to Chairman on January 7, 2021. The Board also formally censured both Mr. Hall and Ms. Hall, and directed them both to receive appropriate remedial training. They will remain members of the Company's Board of Directors.

85.     On this news, the price of the Company's stock dropped from $21.11 per share at the close of trading on February 19, 2021, to $17.97 at the close of trading on February 22, 2021, a drop of $3.14 per share, or approximately 15%, on heavy trading volume. Moreover, the price of the Company's warrants dropped from $7.37 per warrant at the close of trading on February 19, 2021, to $5.90 at the close of trading on February 22, 2021, a drop of $1.47 per warrant, or approximately 20%.

*Subsequent Developments*

86.     Also on or about February 22, 2021, Defendants D. Hall and M. Hall indicated their intent to nominate Eric Singer ("Singer") to the Board and that they had agreed to compensate Singer directly in cash for serving as their nominee on the Board.

87.     Two days later, on February 24, 2021, the Company announced that the Board had appointed Hamid Zarringhalam ("Zarringhalam") as a Company director. On that same day, the Company also announced that the Board had, in effect, extended the term of Defendant Thomas to 2022, who, as the Chairman of the Audit Committee, had led the investigation of the D&O Misconduct.

88.     On March 4, 2021, the Company filed a current report on Form 8-K with the SEC revealing that Defendant D. Hall had voluntarily resigned as a Company director effective March 2, 2021.

## DAMAGES TO VELODYNE

89.     As a direct and proximate result of the Individual Defendants' conduct, Velodyne has lost and expended, and will lose and expend, many millions of dollars.

90.     Such expenditures include, but are not limited to, fees associated with the Company's internal Audit Committee investigation into the D&O Misconduct and legal fees associated with the Securities Class Action filed against the Company, its CEO, and its CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

91.     Such expenditures include, but are not limited to costs associated with the costs of defending investigations of and legal fees associated with any litigation resulting from the D&O Misconduct and for fines or other monies paid in connection thereto.

92.     Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

93.     Additionally, these expenditures include costs associated with remediating the deficiencies in the Company's disclosure controls and internal controls described herein.

94.     As a direct and proximate result of the Individual Defendants' conduct, Velodyne has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

95.     Plaintiff brings this action derivatively and for the benefit of Velodyne to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their

fiduciary duties as directors, officers, and/or controlling shareholders of Velodyne, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets, as well as the aiding and abetting thereof.

96.     Velodyne is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

97.     Plaintiff is, and has continuously been at all relevant times, a shareholder of Velodyne. Plaintiff will adequately and fairly represent the interests of Velodyne in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

98.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

99.     A pre-suit demand on the Board of Velodyne is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants Gopalan, M. Hall, Culkin, Dee, Samardzich, and Thomas (collectively, the "Director-Defendants"), along with non-party Zarringhalam (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors that were on the Board at the time this action was commenced.

100.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially

investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

101.    Demand is also excused as to all of the Director-Defendants because the D&O Misconduct was an unlawful business strategy that the Company engaged in and was not a valid exercise of business judgment. As the ultimate decision-making body of the Company, the Board made and/or allowed the Company to engage in the schemes outlined herein.

102.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

103.    Additional reasons that demand on Defendant Gopalan is futile follow. Defendant Gopalan has served as the Company's President and CEO since January 2020 and as a Company director since July 2019. Previously, he served as Velodyne's CTO since June 2016. Thus, as the Company admits, Defendant Gopalan is a non-independent director. The Company provides Defendant Gopalan with his principal occupation, and he receives handsome compensation for his services. Defendant Gopalan was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in each of the Company's SEC filings and press releases referenced herein, which he either personally made or signed off on and/or signed SOX certifications for. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the D&O Misconduct (which Defendant Gopalan engaged in and/or permitted despite being aware of it) or the Company's engagement in the scheme

to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Gopalan is a defendant in the Securities Class Action. For these reasons, Defendant Gopalan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

104.     Additional reasons that demand on Defendant M. Hall is futile follow. Defendant M. Hall is married to Defendant D. Hall, the Company's founder, and has served as a Company director since January 2020. Previously, she served as the Company's CMO from January 2020 until February 2021. She also served as Velodyne's President and Chief Business Development Officer from December 2015 until January 2020. She also served as Vice President of Marketing of Velodyne's predecessor, Velodyne Acoustics, from 2009 to 2010 and then as President from 2010 until Velodyne was formed as an independent entity in December 2015. Additionally, according to the October 2020 8-K, as of September 29, 2020, Defendant M. Hall, together with her husband, Defendant D. Hall, beneficially owned 92,223,730 shares of the Company's common stock, which represented 56.9% of the Company's outstanding common stock as of September 29, 2020, rendering her, together with her husband, a controlling shareholder. Thus, as the Company admits, Defendant M. Hall is a non-independent director. Upon information and belief, Defendant M. Hall has received and continues to receive compensation for her role as a director. As a trusted Company director and officer at the time, Defendant M. Hall was one of the primary participants, along with her husband, in the D&O Misconduct and the scheme to cause the Company to make false and misleading statements related thereto, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to

protect corporate assets. Moreover, Defendant M. Hall's long-standing personal and professional ties with the Company and the Individual Defendants further preclude her from approaching any demand with disinterestedness and independence. Defendant M. Hall's husband's brother-in-law, Defendant Culkin, is a Company director; her son-in-law, David Heeren, has been employed by the Company since March 2017 as a senior technical product marketing manager and has made $103,129, $179,586, and $184,976 for the fiscal years ended December 31, 2017, 2018, and 2019, respectively; and her husband's daughter, Savannah Hall has been employed as a project coordinator by the Company since March 2017. Defendant M. Hall may fear retaliation against her family, in addition to herself, if she were to consider a demand against the Individual Defendants. For these reasons, Defendant M. Hall breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

105.    Additional reasons that demand on Defendant Culkin is futile follow. Defendant Culkin is the brother-in-law of Defendant D. Hall and has served as a Company director since September 2016 and as Chairman of the Board since February 19, 2021. Additionally, according to the October 2020 8-K, as of September 29, 2020, Defendant Culkin, beneficially owned 13,559,196 shares of the Company's common stock, which represented 7.8% of the Company's outstanding common stock as of September 29, 2020. Thus, as the Company admits, Defendant Culkin is a non-independent director. Upon information and belief, Defendant Culkin has received and continues to receive compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the D&O Misconduct (which Defendant Culkin engaged in and/or permitted despite being aware of it) or the Company's engagement in the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to

monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Culkin's son-in-law, James Schwandt, has been employed by the Company since May 2017 as a senior program manager and has made $111,087, $168,013, and $172,571 for the fiscal years ended December 31, 2017, 2018, and 2019, respectively. Defendant Culkin may fear retaliation against his son-in-law, in addition to himself, if he were to consider a demand against the Individual Defendants, particularly Defendants D. Hall and M. Hall, the primary wrongdoers and effective controllers of the Company. For these reasons, Defendant Culkin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

106.    Additional reasons that demand on Defendant Dee is futile follow. Defendant Dee has served as a Company director since September 2020. He also serves as a member of the Audit Committee. Upon information and belief, Defendant Dee has received and continues to receive compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the D&O Misconduct (which Defendant Dee engaged in and/or permitted despite being aware of it) or the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Dee, as Graf Industrial's CFO, helped negotiate the reverse merger with Defendants Gopalan and Hamer and had a one-on-one dialogue with Defendant M. Hall as well. As such, he was well aware of the D&O Misconduct. For these reasons too, Defendant Dee breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

107.    Additional reasons that demand on Defendant Samardzich is futile follow. Defendant Samardzich has served as a Company director since October 2016. She also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. Upon information and belief, Defendant Samardzich has received and continues to receive compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the D&O Misconduct (which Defendant Samardzich engaged in and/or permitted despite being aware of it) or the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Samardzich breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

108.    Additional reasons that demand on Defendant Thomas is futile follow. Defendant Thomas has served as a Company director since September 2020. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. Upon information and belief, Defendant Thomas has received and continues to receive compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the D&O Misconduct (which Defendant Thomas engaged in and/or permitted despite being aware of it) or the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Thomas breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

109.    Additional reasons that demand on the Board is futile follow.

110.    As the Company acknowledges, Defendant D. Hall exercises significant influence over the business affairs of Velodyne, including any action requiring the approval of the Company's stockholders, such as the election of directors, the approval of a merger, or the sale of substantially all of the Company's assets. Additionally, the Company admits that the interests of Defendant D. Hall may differ from that of other individuals including Velodyne investors. As a result, the Company's Directors are beholden to Defendants D. Hall, M. Hall, and Culkin. Defendant D. Hall and his family, including Defendants M. Hall and Culkin, control 56.9% as of the Company's outstanding stock and, consequently, the controlling share of the voting power in the Company as of September 29, 2020. Thus, they have considerable influence over whether each Board member will retain their seat on the Board in the next Board election. Defendant D. Hall and M. Hall's domination and control over the Board is not just hypothetical. In fact, Defendants D. Hall and M. Hall recently demonstrated their willingness to exert control over Velodyne's Board when, on or about February 22, 2021, they indicated their intent to nominate Singer to the Board. Moreover, Defendants D. Hall and M. Hall agreed to compensate Singer directly in cash for serving as their nominee on the Board.

111.    The Director-Defendants have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, as noted above, Defendants D. Hall and M. Hall are married. Moreover, Defendant Culkin is the brother-in-law of Defendant D. Hall. Defendant Culkin co-founded the Company's predecessor, Velodyne Acoustics, with Defendant D. Hall. Defendants Graf and Dee worked together at Morgan Stanley during the same time period before working together again at Graf Industrial. Defendant Graf served as CEO of Graf Industrial from June 2018 until September 2020. From 1987 to 1993,

Defendant Graf worked as an analyst and then as an associate at Morgan Stanley. Defendant Dee worked as President and CFO and also served as a member of the board of directors of Graf Industrial from September 2018 until September 2020. From 1981 to 2007, Defendant Dee worked at Morgan Stanley in a variety of senior leadership positions in its capital markets, mergers and acquisitions and firm management divisions, including acting as Regional Chief Executive Officer for Southeast Asia and as Head of Morgan Stanley's Houston office. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and timely calling into question and disclosing the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

112.    Defendants Dee, Samardzich, and Thomas (the "Audit Committee Defendants"), served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the integrity of the Company's financial statements, compliance with legal and regulatory requirements, and matters implicating ethical concerns. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

113.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the D&O Misconduct (which they engaged in and/or permitted despite being aware of it) or the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law,

including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. In violation of the Code of Conduct, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

114.    Velodyne has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Velodyne any part of the damages Velodyne suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

115.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

116.    The acts complained of herein constitute violations of fiduciary duties owed by Velodyne's officers and directors, and these acts are incapable of ratification.

117.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Velodyne. If there is a directors' and officers'

liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Velodyne, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

118.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Velodyne to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

119.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

120.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

121.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Velodyne's business and affairs.

122.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

123.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Velodyne.

124.    In breach of their fiduciary duties, the Individual Defendants either engaged in or permitted, and/or allowed the Company to engage in the D&O Misconduct.

125.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

126.    In further breach of their fiduciary duties owed to Velodyne, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*: (1) the D&O Misconduct; (2) that Velodyne and its Audit Committee had been investigating the D&O Misconduct; (3) consequently, the statements touting Velodyne's business, operations, and prospects were materially false and misleading and/or lacked a rational basis; and (4) that Velodyne failed to maintain internal controls. As a result of the foregoing, Velodyne's public statements were materially false and misleading at all relevant times.

127.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

128.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public

statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

129.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

130.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

131.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Velodyne has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

132.   Plaintiff on behalf of Velodyne has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

133.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

134.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Velodyne.

135.    The Individual Defendants either benefitted financially from the improper conduct, and/or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Velodyne that was tied to the performance or artificially inflated valuation of Velodyne, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

136.    Plaintiff, as a shareholder and representative of Velodyne, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

137.    Plaintiff on behalf of Velodyne has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Abuse of Control

138.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

44

139.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Velodyne, for which they are legally responsible.

140.    As a direct and proximate result of the Individual Defendants' abuse of control, Velodyne has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Velodyne has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

141.    Plaintiff on behalf of Velodyne has no adequate remedy at law.

### FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

142.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

143.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Velodyne in a manner consistent with the operations of a publicly-held corporation.

144.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Velodyne has sustained and will continue to sustain significant damages.

145.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

146.    Plaintiff on behalf of Velodyne has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

147.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

148.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (such as the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

149.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

150.    Plaintiff on behalf of Velodyne has no adequate remedy at law.

## SIXTH CLAIM

### Against Defendants Gopalan and Hamer for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

151.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

152.    Velodyne, along with Defendants Gopalan and Hamer are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Gopalan and Hamer's willful and/or reckless violations of their obligations as officers and/or directors of Velodyne.

153.    Defendants Gopalan and Hamer, because of their positions of control and authority as officers and/or directors of Velodyne, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Velodyne, including the wrongful acts complained of herein and in the Securities Class Action.

154.    Accordingly, Defendants Gopalan and Hamer are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

155.    As such, Velodyne is entitled to receive all appropriate contribution or indemnification from Defendants Gopalan and Hamer.

**PRAYER FOR RELIEF**

156.    FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Velodyne, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Velodyne;

(c)    Determining and awarding to Velodyne the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Velodyne and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Velodyne and its shareholders from a repeat of the damaging events

described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

       1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

       2. a provision to permit the shareholders of Velodyne to nominate at least four candidates for election to the Board; and

       3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

       (e)    Awarding Velodyne restitution from the Individual Defendants, and each of them;

       (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

       (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 12, 2021

Of Counsel:

Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
Email: mfarnan@farnanlaw.com

*Attorneys for Plaintiff*